WILLIAM K. HARRINGTON
United States Trustee for Region 2
Office of the United States Trustee
One Bowling Green, Room 534
New York, New York 10004
Telephone: (212) 510-0500
By: Daniel Rudewicz, Trial Attorney

**Hearing Date:  May 28, 2026**
**Hearing Time: 10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                                    Chapter 11

    CITI CONNECT, LLC,                          Case No. 25-10369 (LGB)

                Debtor.

# MOTION OF THE UNITED STATES TRUSTEE
# TO APPOINT A CHAPTER 11 TRUSTEE

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee") files this motion (the "Motion") for an order directing the United States Trustee to appoint a chapter 11 trustee. In support thereof, the United States Trustee represents and alleges as follows:

## INTRODUCTION

Sufficient grounds exist to appoint a chapter 11 trustee in this case for several reasons. First, it appears likely that the Debtor will need to investigate substantial monetary transactions made between the Debtor and non-Debtor companies. Because the principals of the Debtor are the same principals or family members of the non-Debtor companies involved in these transactions, it does not appear likely that a robust investigation will be conducted by the Debtor. And even if such was the case, such an investigation will be clouded by the close relationships between all of these companies.

Specifically, the ownership of the Debtor is closely held by two individuals – one who owns a 49% share and the other who owns a 51% share. The Debtor operates a cable installation company. The Debtor's principals also own all of the equity of non-Debtor Citi Connect Industries LLC ("Industries"). Industries is a subcontractor to the Debtor. In its initially filed Schedules, the Debtor did not report any receivables or payables from affiliates. Yet, when questioned about the accuracy of this information during the Meeting of Creditors, the Debtor's representative explained that any receivables or payables from Industries had been written off as "bad debt." Subsequently, however, the Debtor amended its schedules to disclose an over $1 million receivable owed to the Debtor by Industries (as well as a $ 3 million payable to Industries). Further investigation into these transactions will be required.

- 1 -

Similarly, the Debtor's principals and certain respective family members own all of the equity in non-Debtor Corbel Communications Industries LLC ("Corbel"). Non-Debtor Corbel does not have a business relationship with the Debtor other than as a borrower. The Debtor engaged in several significant transfers with non-Debtor Corbel. These transfers—which were never repaid and were later treated as a distribution to one of the Debtor's principals—totaled over $1 million.  Again, these transactions must be investigated, but it is unlikely that the Debtor will be able to conduct a fulsome investigation given the relationship between its principals and the principals of the non-Debtor companies Corbel and Industries.

Moreover, based on information obtained thus far, it appears that the total combined distributions from the Debtor to the Debtor's principals were over $4 million in 2022 and approximately $250,000 in 2024. In addition, the Debtor's funds have been used to pay the mortgage for the personal residence of the one of the Debtor's principals. Again, these transactions must be investigated in order to determine whether additional assets can be located for the benefit of the Debtor's estate. Such an investigation must be done by an independent fiduciary, not by the Debtor's principals who appear to have been the beneficiaries. Furthermore, the Debtor's lack of transparency and accuracy with respect to interactions and transactions between the Debtor, Corbel and Industries amounts to inadequate record keeping, yet another reason for the appointment of a Chapter 11 Trustee.

For these reasons and the reasons set forth below, the United States Trustee respectfully ask this Court to enter an order directing the appointment of a chapter 11 trustee.

## BACKGROUND

1.      On February 27, 2025 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").[1] *See* Petition [ECF No. 1].

2.      The Debtor continues to control and maintain its assets and operations as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      On November 25, 2025, the court entered the *Order Pursuant to Bankruptcy Rule 2004 Authorizing and Directing the Production of Documents from and Examinations of the Debtor and Certain Third Parties* [ECF No. 46].

4.      The Debtor is owned by two individuals: (i) Carlos Heredia, who owns 51% of the Debtor's equity and (ii) Angelo Pino, who owns 49% of the Debtor's equity. *See* Petition, at 8.[2]

5.      Carlos Heredia acquired 51% ownership of the Debtor in January 2023 from Angelo Pino.[3] Carlos Heredia paid Angelo Pino $36,000 for the 51% equity ownership.[4]

---

[1] Unless otherwise stated herein, all section references are to the Bankruptcy Code.

[2] *See also Transcript of Section 341 Meeting of Creditors held March 28, 2025* ("March 28 Section 341 Meeting Transcript") at 6:3-17. A copy of the March 28 Section 341 Meeting Transcript is attached hereto as Exhibit A.

[3] *See Transcript of Continued Section 341 Meeting of Creditors held June 3, 2023* ("June 3 Section 341 Meeting Transcript") at 15:8-20 ("MR. RUDEWICZ: You became a part owner in January of 2023, that's what you testified to before. Is that correct? MR. HEREDIA: Yes. MR. RUDEWICZ: Did you purchase your ownership stake from anybody? MR. HEREDIA: yes. MR. RUDEWICZ: Who did you purchase it from? MR. HEREDIA: I bought my shares, I bought some shares from Mr. Pino. MR. RUDEWICZ: So, all of the ownership shares that you purchased were from Mr. Pino? MR. HEREDIA: Correct. He was 100 percent owner."). A copy of the June 3 Section 341 Meeting Transcript is attached hereto as Exhibit B.

[4] *See* June 3 Section 341 Meeting Transcript at 16:11-13 ("MR. RUDEWICZ: Okay. How much did you pay for your ownership stake in the Debtor? MR. HEREDIA: $36,000.").

Citi Connect Industries

6.      The Debtor operates as a communications cable installation and repair company that provides for the installation of communication cable and equipment.[5] The Debtor also uses the services of subcontractor Industries to perform certain construction work associated with the installation.[6] Non-Debtor Industries would owe the Debtor for management fees and the Debtor would owe Industries for construction work.[7]

7.      The ownership of non-Debtor Industries is the same as the Debtor (Citi Connect LLC): Carlos Heredia owns 51% and Angelo Pino owns 49%.[8]

8.       Similar to acquiring his ownership interest in the Debtor, Carlos Heredia

---

[5] See Local Rule 1007 Affidavit [ECF No. 1], Exh. 2 at ¶ 3.

[6] *Transcript of Rule 2004 Examination held July 17, 2023* ("Rule 2004 Transcript") at 53:9-15 ("Q.· ·Please describe Citi Connect Industries. A. They are -- at the time they would just do some construction work.· They would do pathway work and maintenance work as well.· And they were just acting as a sub to Citi Connect because Citi Connect really didn't do construction.· So whatever they had, we would just do and sub it to them. Q.· ·Are you referring to subcontract work? A.· ·Yeah."); *see also Transcript of Section 341 Meeting of Creditors held March 28, 2025* ("March 28 Section 341 Meeting Transcript") at 21:18-20 ("[W]hen we would get construction work, which would require us to put cable inside the building, that work would be deferred to Citi Connect Industries."); June 3 Section 341 Meeting Transcript at 11:1-11 ("MR. HEREDIA: Industries was doing construction work for LLC. MR. RUDEWICZ: Okay. So, Citi Connect Industries LLC did construction work for the Debtor. Is that correct? MR. HEREDIA: Correct."). A copy of the Rule 2004 Transcript is attached hereto as Exhibit C.

[7] June 3 Section 341 Meeting Transcript at 11:11-23 ("MR. RUDEWICZ: You've listed an amount due from Citi Connect Industries LLC, over $1 million is owed to the Debtor. Is that correct? MR. HEREDIA: Yes, that's for management fees over the '21, '22, '23. MR. RUDEWICZ: And can you please describe those management fees? MR. HEREDIA: They share an office. They have a staff doing paperwork, back end, invoices, prints, you name it."); *see also id.* at 13:7-11 ("MR. RUDEWICZ: Okay. And so, why does the Debtor owe Citi Connect Industries that amount? MR. HEREDIA: So, that's construction work and part of -- that's mostly construction work, unpaid invoices. MR. RUDEWICZ: Okay. MR. HEREDIA: So, construction work. So, Industries does the construction work for LLC.").

[8] Rule 2004 Transcript at 20:3-5 ("Q.· ·What percentage of Citi Connect Industries do you own? A.· ·Forty-nine."); June 3 Section 341 Meeting Transcript at 24:23-25:1 ("MS. MOOSNICK: What was the ownership makeup of Citi Connect Industries LLC before Mr. Heredia bought his 51 percent? MR. PINO: At the time, I owned 100 percent.").

acquired 51% ownership of non-Debtor Industries in January 2023 from Angelo Pino as well.[9]

9.      Other than common equity ownership, the entities were separate entities.[10]

10.     According to the Debtor's books and records, non-Debtor Industries and the Debtor would engage in approximately 1,000 transactions in a given year.[11]

11.     On May 13, 2025, the Debtor filed its schedules of assets and liabilities (the "Schedules") and statement of financial affairs (the "SOFA"). ECF No. 7. The Debtor listed total accounts receivable of $241,357.01. *See id.* at 4-7. No other accounts receivable were reported. *See id.*

12.     On March 28, 2025, at the Debtor's initial Section 341 Meeting of Creditors, Mohammed Sattar, who is the Debtor's bookkeeper, testified that there were no other accounts receivable other than the $241,357.01 listed in the Schedules.[12] When asked about the amount

---

[9] June 3 Section 341 Meeting Transcript at 9:6-10:1 ("MR. RUDEWICZ: Who owns Citi Connect Industries LLC? MR. HEREDIA: I do. And [Mr. Pino], I'm 51 percent owner on that one also. . . .MR. RUDEWICZ: Okay. So, when did you acquire ownership of the Debtor? MR. HEREDIA: In '23. MR. RUDEWICZ: What's --? MR. HEREDIA: January '23. MR. RUDEWICZ: January, you said? MR. HEREDIA: Yes. MR. RUDEWICZ: So, in January of 2023, and then when did you become an owner of Citi Connect Industries LLC? MR. HEREDIA: The same time. MR. RUDEWICZ: January 2023? MR. HEREDIA: Yes.").

[10] Rule 2004 Transcript at 19:17 -23 ("Q.· ·And please describe the Debtor's relationship with Citi Connect Industries? A.· ·That was the company that I owned as well, and they did the construction portion, basically a sub to Citi LLC. Q.· ·And when you say a sub to Citi LLC, are they a subsidiary of Citi LLC? A.· ·No.· Totally separate entity.").

[11] Rule 2004 Transcript at 52:5-53:7 ("Q.· ·Thank you.· Mr. Pino, do you recognize what has been marked for identification as Exhibit 17? A.· ·Yes. Q.· ·What is it? A.· ·General Ledger.  Q.· ·Is it true and accurate? A.· ·Yes. . . .Q.· ·Okay.· Mr. Pino, in this General Ledger, the transactions marked after 5200 reflect increases in accounts payable to Citi Connect Industries, correct? A.· ·Correct. . . . Q.· ·Mr. Pino, there were a number of transactions from line 5200 to 6200, correct? A.· ·Correct. Q.· ·With counterparty Citi Connect Industries, correct? A.· ·Correct. Q.· ·With one transaction per line, there were approximately a thousand transactions with Citi Connect Industries, correct? A.· ·Correct.").

[12] March 28 Section 341 Meeting Transcript at 18:8-12 ("MR. RUDEWICZ: Okay. If you go to Part 3, Accounts Receivable. It says, "Does the Debtor have any accounts receivable?" and at Number 11, can you read off the answer? MR. SATTAR: It is $241,357.01."); *id.* at 19:13-18 ("MR. RUDEWICZ: . . .So, other than the potential employee retention credit, are there any other accounts receivable other than what was listed in Part 3 or at Part 77?

due from Industries reported on the Debtor's tax returns, Mohammed Sattar testified that such amounts "would be considered bad debt."[13]  When asked if there are any documents that show that such amount was written off as bad debt, Mohammed Sattar stated "not right now."[14]

13.     On April 25, 2025, the United States Trustee requested additional documentation from the Debtor. A copy of the United States Trustee's letter is attached hereto as Exhibit D.

14.     On May 9, 2025, the Debtor responded via letter disclosing, among other things, that "Industries is currently due approximately $3,000,000.00 from the Debtor" and certain transfers and loans between the Debtor and Corbel Communication Industries, which such transfers were claimed to be necessary due to an alleged "fraud perpetrated on Corbel by its former COO." *See* Exh. E, at 1-2.  A copy of the Debtor's letter is attached hereto as Exhibit E.

15.     On June 2, 2025, the Debtor filed Amended Schedule A/B. ECF No. 33. In the Amended Schedules, the following amounts that were not previously disclosed in the Schedules, were added:

- Schedule A/B: "Amounts due from Citi Connect Industries LLC under management

---

MR. SATTAR: No, there are no other accounts receivable.").

[13] March 28 Section 341 Meeting Transcript at 19:19-20:11 ("MR. RUDEWICZ: Okay. On the tax form, we did see that there was an amount due from affiliates from Citi Connect Industries, LLC. Are there any amounts -- MR. SATTAR: Yes. MR. RUDEWICZ: -- as of the petition date that was owed from that entity? MR. SATTAR: No. Those would be considered with us. It would be considered bad debt because that activity resulted in them not getting paid. I know they're on the tax return, and we had told our accountants that we need to adjust them as bad debts. But I don't know why they haven't done that yet. MR. RUDEWICZ: Okay. So, the whole amount was written off as bad debt. Do you know when the adjustment was made, in what calendar year? MR. SATTAR: We have asked our accountant and I know we have not filed the '24 tax return, so I'm hoping that it would be adjusted in '24.").

[14] March 28 Section 341 Meeting Transcript at 20:12-20 ("MR. RUDEWICZ: Okay. Thank you. Okay, and then, it would be adjusted in the calendar year 2024. So, has it been -- was there any documents that have shown that it was written off as bad debt? MR. SATTAR: (indiscernible) Can you repeat that? I'm sorry. I didn't hear it. MR. RUDEWICZ: Yes. Were there any documents that showed that it was written off as bad debt? MR. SATTAR: Not right now.").

agreement for 2021, 2022 and 2023: $1,057,641.00."

- Schedule E/F: "Creditors Who Have Unsecured Claims: Citi Connect Industries LLC, 450 Southern Boulevard, Bronx, New York 10455, Consideration: Due on account of work performed under subcontract. Creditor is an affiliated entity. Amount of Claim: $2,993,874.66." ECF No. 33.

Corbel Communications

16.     Corbel is owned 90% by Angelo Pino and the other 10% is owned by his two sons, with 5% each. [15]

17.     Other than common ownership, Corbel and the Debtor do not share any business relationship other than loans. [16]

18.     On June 3, 2025, at the Debtor's continued Section 341 Meeting of Creditors, Angelo Pino testified that the Debtor made a loan in amount of "around $230,000" to Corbel Communication Industries.[17] Corbel never paid back the Debtor, and Angelo Pino took a

---

[15] June 3 Section 341 Meeting Transcript at 23:1-5 ("MR. RUDEWICZ: And you, how much of Corbel Communications Industries do you own? MR. PINO: 90 percent. MR. RUDEWICZ: Who owns the other 10 percent? MR. PINO: My sons each own 5. MR. RUDEWICZ: And so, you're unaware of any other transfers between the two entities in the -- other than the loan. Is that correct? MR. PINO: Correct.").

[16] Rule 2004 Transcript  at 48:7-15 ("Q. And was Corbel Communications Industries a vendor, customer, or in any way a regular counterparty to any contracts with the Debtor? A.· ·Other than -- no.· No.· Other than this Promissory Note, no. Q.· ·So other than this loan, prior to having the loan, the Debtor and Corbel Communications Industries typically did not do business together? A.· ·Correct.").

[17] June 3 Section 341 Meeting Transcript at 20:2-17("[MR. RUDEWICZ:] Can you please describe any loans that were made by the Debtor to Corbel Communications Industries? MR. PINO: There was a loan made to cover payroll on an emergency basis, that was made to -- I don't know the exact date, but that was just, basically, a short term. It was supposed to be a short-term loan for payroll. MR. RUDEWICZ: Okay. And on or around -- I know you said you don't know the exact date off the top of your head -- on or around what month did this loan, month and year, did this loan occur? MR. PINO: It should have been 20, September of '22. MR. RUDEWICZ: Okay. And how much was this loan for? MR. PINO: Around $230,000.").

personal distribution to offset such unpaid loan.[18] When asked if there were any other transfers, either from the Debtor to Corbel Communications or from Corbel Communications to the Debtor in the 48 months prior to the petition date that were above $100,000, Angelo Pino testified " Not that I'm aware of. I'd have to go look."[19] Angelo Pino later confirmed that he was unaware of any other transfers.[20]

19.      Later, as part of the Rule 2004 examination, additional loans and transfers to Corbel were disclosed. More specifically, in 2021, Corbel borrowed funds from the Debtor in three instances as evidenced by the relevant Promissory Notes:

- On May 14, 2021, Corbel borrowed $200,000 from the Debtor.

- On August 31, 2021, Corbel borrowed $320,000 from the Debtor.

- On September 3, 2021, Corbel borrowed $220,917.39 from the Debtor.

20.      Angelo Pino testified in sum and substance that Corbel never paid the Debtor back and the Debtor made an accounting adjustment to treat the unpaid loans as a distribution to Angelo Pino (who was the 100% owner of the Debtor at the time).[21]

---

[18] June 3 Section 341 Meeting Transcript at 21:13-20 ("MR. RUDEWICZ: So, Citi Connect loaned the money to Corbel, and Corbel has not paid back. What's the current outstanding balance. MR. PINO: So, what we wound up doing was, after speaking to our accountants, we wound up doing was, we decided to, where I would take it as a personal distribution to offset the loan. So, that's why nothing is outstanding at this time.").

[19] June 3 Section 341 Meeting Transcript at 22:16-25 ("MR. RUDEWICZ: And how much was this loan for? MR. PINO: That was the $230,000 and change. MR. RUDEWICZ: Okay. And were there any other transfers, either from the Debtor to Corbel Communications or from Corbel Communications to the Debtor -- MR. PINO: Right. MR. RUDEWICZ: -- above $100,000, in the 48 months prior to the petition date? MR. PINO: Not that I'm aware of. I'd have to go look.").

[20] June 3 Section 341 Meeting Transcript at 23:6-9 ("MR. RUDEWICZ: And so, you're unaware of any other transfers between the two entities in the -- other than the loan. Is that correct? MR. PINO: Correct.").

[21] Rule 2004 Transcript at 51:7-14 ("Q. And like the other loans for 320,000 and 220 --200,000, the due date on this loan was December 31, 2021? A.· ·That's correct, yes. Q.· ·Did Corbel Communications ever pay back this loan?

21.      All three Promissory notes were signed by Angleo Pino on behalf of both Corbel and the Debtor.[22]

22.      In addition to the three loans in 2021, the Debtor also made additional loans and transfers to Corbel, including: (a) December 2021 transfers of $100,000 and $25,000, which amounts were never repaid to the Debtor;[23] and (b) payments made with the Debtor's funds on behalf of Corbel to insurance carriers, some of which were paid back and others which were not.[24]

23.      In total, over $1 million in loans and transfers were made by the Debtor to Corbel that were never paid back.[25] These unpaid amounts were later treated as a distribution to Angelo Pino.[26]

---

A.· ·No. Q.· ·Was this loan treated as a distribution to your equity account for the Debtor? A.· ·Yes.").

[22] Rule 2004 Transcript at 50:4-6 ("Q.· ·Similar to the prior loan, you signed for both the Debtor and Corbel Communication Industries, correct? A.· ·Yes."); Rule 2004 Transcript at 51:18-21 ("Q.· ·For this Promissory Note for this loan as well, you signed both on behalf of the Debtor and Corbel Communication Industries, correct? A.· ·Yes, that's correct.").

[23] Rule 2004 Transcript at 59:17-23 ("Q.· ·With respect to the two transactions on December 3, 2021, in the amount of 25,000 and 100,000, were those amounts ever paid back by Corbel? A.· ·No. Q.· ·Were those amounts treated as a distribution to the equity holders?" A.· ·Yes.).

[24] Rule 2004 Transcript at 56:23-57:9 ("Q. For the transaction listed at 8639, there's a transaction on July 30, 2021, in the amount of $149,412 was transferred to Corbel.· Do you know what this amount was for? A.· ·To pay our auto insurance. Q.· ·When you said "to pay our auto insurance," so an amount left was used by the Debtor to pay auto insurance for Corbel Communications? A.· ·Correct. Q.· ·Did Corbel Communications ever pay this amount back to the Debtor? A.· ·No."); Rule 2004 Transcript at 62:6 ("Q. And then on July 27, 2022, there was a transaction with Corbel in the amount of $14,627.99.· Do you see that? A.· ·Yes. Q.· ·What was this transaction for? A.· ·That was to pay some of our insurance. Q.· ·And in both of those transactions, there's a positive transaction and a negative transaction. Does that mean that Corbel repaid the amounts? A.· ·It looks that way.").

[25] Rule 2004 Transcript at 58:24-59:4 ("Q.· ·Thank you.· If you look at -- of those six transactions we just described, if you look at line 8,644 total Corbel GF and column S totals the amounts up.· The total of these amounts, these transfers to the Corbel, which were not paid back, totaled the amount of $1,015,383.39, correct? A.· ·Correct.").

[26] Rule 2004 Transcript at 62:19-63:7 (" Q.· ·Mr. Pino, in the same category of Corbel GF, there's a general journal

Additional Distributions Made with Debtor Funds

24.     The Debtor's funds were also used to pay the mortgage for the personal residence of Angelo Pino.[27] These mortgage payments were treated as a distribution.[28]

25.     According to the Debtor's internal books and records, the Debtor made over $4 million in distributions to Angelo Pino.[29] The Debtor's 2022 tax returns showed similar write down of amounts due from affiliates and corresponding distributions in excess of $4 million.[30]

26.     There were other distributions such as a $250,000 distribution to a shareholder made in the year 2024.[31]

---

entry on December 31, 2022, in the category of 30 -- 300 member one draws in the amount of a negative $1,107,216.00, correct? A.· ·Yes. Q.· ·What was this distribution for? A.· ·I don't recall off the top of my head.· It's probably just a distribution that the accountants used. Q.· ·To reduce the Corbel GF account. A.· ·I would believe so. Q.· ·Would this be when the distribution on account of equity was made? A.· ·I would believe, if that's the way that they booked it, yes.").

[27] Rule 2004 Transcript at 65:13-25 (" Q.· ·All right, if you can scroll to 4275.· Thank you. Mr. Pino, in the category labeled total 3300 member one draws, there are a series of transactions labeled Nationstar Mortgage LLC in the amount of approximately 6 to $7,000.· Do you see that? A.· ·Yes. Q.· ·Can you please describe what these payments were for? A.· ·A mortgage payment. Q.· ·A mortgage payment for -- on behalf of you or a different equity holder? A.· ·On behalf of me. Q.· ·So this was paid for your personal residence? A.· ·Yes.").

[28] Rule 2004 Transcript at 66:1-3 ("Q.· ·So, Mr. Pino, your testimony is that the Debtor would pay out monthly mortgage payments on your personal residence? A.· ·I believe it was taken as a distribution.").

[29] Rule 2004 Transcript at 63:8-18 ("Q.· ·Thank you.· Can you scroll to 6284?· All right. Thank you.· Mr. Pino, line 62 -- 6287 lists a general journal entry on December 31, 2022, in the amount of $4,020,193.· Do you see that? A.· ·Yes. Q.· ·What does this transaction reflect? A.· ·I think that's however they wrote the distribution. The accountants took it. Q.· ·So in the year 2022, you took a distribution in the amount of just over 4 million, correct? A.· ·Yes."); *id.* at 38:21 -39:6 ("Q. Mr. Pino, the amount listed as due from affiliate for the beginning was $4,543,633, correct? A.· ·Yes. Q.· ·And the amount listed for ending was $858,698, correct? A.· ·Yes. Q.· ·What would explain this change from the beginning amount to the ending amount? A.· ·It would be the inability to pay back the money that was owed due to the financial situation that Corbel was in at the time.").

[30] Rule 2004 Transcript at 40:14-16 ("Q.· ·And, Mr. Pino, the total amount of cash distributions from the Debtor in the year 2022 was $4,049,955, correct? A.· ·Correct.").

[31] Rule 2004 Transcript at 69:3-15 ("Q.· ·Okay.· And then at line 3466, there is a loan to shareholder in the amount of $250,189, correct?  A.· ·Correct. Q.· ·What was this loan? A.· ·Oh, God, let me think.· I think that was just one of the things the accountants were doing to -- it was like a receivable they were doing to how they listed it. Q.· ·Did the Debtor make a cash distribution to any shareholder in the amount of $250,000? A.· ·No, it was all just on-the-books

- 10 -

**ARGUMENT**

I.    **The Court Should Appoint a Chapter 11 Trustee Either for Cause or Because it is in the Best Interests of Creditors and Other Interests of the Estate**

"While there is a presumption that a debtor should be permitted to remain in possession of its business, that presumption is not absolute." *In re Sillerman*, 605 B.R. 631, 640 (Bankr. S.D.N.Y. 2019). Section 1104(a) provides for two paths to the appointment of a chapter 11 trustee: (1) for cause or (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate. 11 U.S.C. § 1104(a)(1) and (2).

A.    **Appointment for Cause Pursuant to Section 1104(a)(1)**

Section 1104(a)(1) states in relevant part:

[T]he court shall order the appointment of a trustee . . . for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(1). Thus, "cause" under section 1104(a)(1) includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management . . ." *Id.* This partial list is not exhaustive. *In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. 2015). "The words 'including' and 'or similar cause' allow the court to consider other conduct in analyzing whether there is cause to appoint a trustee." *Sillerman*, 605 B.R. at 641. "Examples of non-enumerated misconduct found by courts to constitute cause include: (i) failure to comply with provisions of the Bankruptcy Code; (ii)

---

distribution. Q.·  ·So this amount was a distribution to a shareholder? Do you know what shareholder it was? A.·  ·It was probably me.").

failure to make required filings; (iii) failure to abide by Court Orders; (iv) failure to file tax returns; (v) conflicts of interest; and (vi) failure to discharge fiduciary duties." *Id.* at 641–42 (internal citations omitted); *see also Ashley River Consulting,* 2015 WL 1540941, at \*9 (Bankr. S.D.N.Y. 2015) ("[S]ome other '[f]actors relevant to the appointment of a trustee under § 1104(a)(1) include: . . . inadequate record keeping and reporting.'" (citing *In re Altman*, 230 B.R. 6, 16 (Bankr. D. Conn.1999))).

With respect to the factors relevant herein, cause exists under the following—any one of which is sufficient to appoint a chapter 11 trustee: (i) failure to discharge fiduciary duties; (ii) inadequate record keeping and reporting; and (iii) conflicts of interest.

### 1.    Failure to Discharge Fiduciary Duties

A debtor's failure to fulfill its fiduciary obligations, including pursuit of avoidance actions, is cause to appoint a chapter 11 trustee. "'The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee.'" *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (quoting *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525–26 (Bankr. E.D.N.Y. 1989). "The Debtor's failure to investigate and/or file avoidance and recovery actions manifestly could cause the estate to forfeit proceeds to which it would otherwise be entitled. Taken alone, the Debtor's failure to investigate avoidance actions signals a breach of fiduciary duty sufficient to justify a finding of 'cause' under 1104(a)(1)." *Sillerman*, 605 B.R. at 648. "The law is clear that if a debtor-in-possession neglects its fiduciary duties, the court should appoint a

- 12 -

chapter 11 trustee." *Id.* (citing *Ashley River Consulting*, 2015 WL 1540941, at \*8; *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990); *see also In re Soundview Elite, Ltd.,* 503 B.R. 571, 582 (Bankr. S.D.N.Y. 2014) ("It is wholly unrealistic to expect the Debtors' current management to appropriately investigate and prosecute potential breach of fiduciary duty actions and avoidance actions so long as current management, which will be the focus of much of the investigation, remains in place.").

Here, it is unrealistic to expect the Debtor's current management to investigate and pursue any potential avoidance actions on account of prepetition transfers to themselves. The list of potential avoidance actions here is large, including (i) over $1 million in loans and transfers that were made to Corbel but were never paid back, which unpaid amounts were later treated as a distribution to Angelo Pino;[32] (ii) the use of Debtor's funds to pay the mortgage on the personal residence of principal Angelo Pino;[33] and (iii) other distributions to Angelo Pino, which according to the Debtor's own books and records and tax filings, were (a) in excess of $4 million

---

[32] Rule 2004 Transcript at 58:24-59:4 ("Q.· ·Thank you.· If you look at -- of those six transactions we just described, if you look at line 8,644 total Corbel GF and column S totals the amounts up.· The total of these amounts, these transfers to the Corbel, which were not paid back, totaled the amount of $1,015,383.39, correct? A.· ·Correct."); *id.* at 62:19-63:7 (" Q.· ·Mr. Pino, in the same category of Corbel GF, there's a general journal entry on December 31, 2022, in the category of 30 -- 300 member one draws in the amount of a negative $1,107,216.00, correct? A.· ·Yes. Q.· ·What was this distribution for? A.· ·I don't recall off the top of my head.· It's probably just a distribution that the accountants used. Q.· ·To reduce the Corbel GF account. A.· ·I would believe so. Q.· ·Would this be when the distribution on account of equity was made? A.· ·I would believe, if that's the way that they booked it, yes.").

[33] Rule 2004 Transcript at 65:13-25 ("Q.· ·All right, if you can scroll to 4275.· Thank you. Mr. Pino, in the category labeled total 3300 member one draws, there are a series of transactions labeled Nationstar Mortgage LLC in the amount of approximately 6 to $7,000.· Do you see that? A.· ·Yes. Q.· ·Can you please describe what these payments were for? A.· ·A mortgage payment. Q.· ·A mortgage payment for -- on behalf of you or a different equity holder? A.· ·On behalf of me. Q.· ·So this was paid for your personal residence? A.· ·Yes.").

in the year 2022[34] and (b) at least $250,000 in the year 2024.[35] Considering the numerous and significant distributions to the Debtor's principals, any investigation into whether there is a potential constructively fraudulent transfers (or other potential avoidance actions) is unlikely to occur, especially considering that any such action would be commenced on behalf of the Debtor by the Debtor's principal who received such transfers. Accordingly, there is cause for the appointment of a chapter 11 trustee because the Debtor's current management cannot be expected to carry out the fiduciary responsibilities of a trustee.

### 2.    Inadequate Record Keeping and Reporting

Caselaw regarding the appointment of a chapter 11 trustee has "established that failure to keep adequate records and make prompt and complete reports justifies the appointment of a trustee." *In re Oklahoma Ref. Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988); *see also In re U.S. Commc'ns of Westchester, Inc.*, 123 B.R. 491, 495 (Bankr. S.D.N.Y. 1991) (finding cause existed to appoint a chapter 11 trustee, noting that "the debtor's failure to maintain a current general

---

[34] Rule 2004 Transcript at 63:8-18 ("Q.· ·Thank you.· Can you scroll to 6284?· All right. Thank you.· Mr. Pino, line 62 -- 6287 lists a general journal entry on December 31, 2022, in the amount of $4,020,193.· Do you see that? A.· ·Yes. Q.· ·What does this transaction reflect? A.· ·I think that's however they wrote the distribution. The accountants took it. Q.· ·So in the year 2022, you took a distribution in the amount of just over 4 million, correct? A.· ·Yes."); *id.* at 38:21 -39:6 ("Q. Mr. Pino, the amount listed as due from affiliate for the beginning was $4,543,633, correct? A.· ·Yes. Q.· ·And the amount listed for ending was $858,698, correct? A.· ·Yes. Q.· ·What would explain this change from the beginning amount to the ending amount? A.· ·It would be the inability to pay back the money that was owed due to the financial situation that Corbel was in at the time."); Rule 2004 Transcript at 40:14-16 ("Q.· ·And, Mr. Pino, the total amount of cash distributions from the Debtor in the year 2022 was $4,049,955, correct? A.· ·Correct.").

[35] Rule 2004 Transcript at 69:3-15 ("Q.· ·Okay.· And then at line 3466, there is a loan to shareholder in the amount of $250,189, correct?  A.· ·Correct. Q.· ·What was this loan? A.· ·Oh, God, let me think.· I think that was just one of the things the accountants were doing to -- it was like a receivable they were doing to how they listed it. Q.· ·Did the Debtor make a cash distribution to any shareholder in the amount of $250,000? A.· ·No, it was all just on-the-books distribution. Q.· ·So this amount was a distribution to a shareholder? Do you know what shareholder it was? A.· ·It was probably me.").

ledger and its failure to maintain its financial books and records . . . , are cogent examples of business incompetence").

Here, the Debtor's initial bankruptcy schedules failed to disclose any accounts payable or accounts receivable with Industries. ECF No. 7. The Debtor only amended its schedules after the Debtor's representative was asked about such amounts at the section 341 meeting of creditors. *See* ECF No. 33. And the Debtor's initial response when asked about the Industries receivable—which is a potential Debtor asset—was that such amounts were written off as bad debt.[36] But that statement was incorrect, according to the Debtor's amended schedules.

Accordingly, there is cause for the appointment of a chapter 11 trustee because the Debtor's current accounting system is not adequate.

### 3.  Conflicts of Interest

Conflicts of interest between a debtor's principal and other entities warrant the appointment of a trustee. "Courts may find a conflict of interest, which can constitute cause for appointment of a trustee, where the debtor has inappropriate dealings with an entity in which the debtor has an interest." *Sillerman*, 605 B.R. at 646–47 (citations omitted).

---

[36] March 28 Section 341 Meeting Transcript at 19:19-20:11 ("MR. RUDEWICZ: Okay. On the tax form, we did see that there was an amount due from affiliates from Citi Connect Industries, LLC. Are there any amounts -- MR. SATTAR: Yes. MR. RUDEWICZ: -- as of the petition date that was owed from that entity? MR. SATTAR: No. Those would be considered with us. It would be considered bad debt because that activity resulted in them not getting paid. I know they're on the tax return, and we had told our accountants that we need to adjust them as bad debts. But I don't know why they haven't done that yet. MR. RUDEWICZ: Okay. So, the whole amount was written off as bad debt. Do you know when the adjustment was made, in what calendar year? MR. SATTAR: We have asked our accountant and I know we have not filed the '24 tax return, so I'm hoping that it would be adjusted in '24.").

In *In re McCorhill Publishing, Inc.*, the United States Bankruptcy Court for the Southern District of New York appointed chapter 11 trustee after finding that the debtor's principals had conflicts of interest. 73 B.R. 1013 (Bankr. S.D.N.Y. 1987). The *McCorhill* debtor rented a New York City office for $5,000 per month. *Id.* at 1015. The *McCorhill* debtor's principals had numerous affiliated entities. *Id.* at 1015. These affiliated entities were allowed to use the debtor's New York City office without reimbursing or paying rent to the debtor. *Id.* at 1015–16. In addition, the debtor's financial records—which the court noted were "loosely maintained and . . . incomplete"—showed that there were payments of "$27,500 to [a debtor principal] for disbursements in connection with the New York City office," with no record to show where the money went. *Id.* at 1016. The court, after reviewing all the facts, noted that "[i]t appears that the debtor's funds are being siphoned off to pay for the expenses and obligations of other entities in which the debtor's principals are financially interested, all to the detriment of the debtor's creditors." *Id.* The court found that the appointment of a chapter 11 trustee was warranted. *Id.* at 1017.

Here, there are numerous instances where the Debtor's funds were transferred to potentially benefit the Debtor's principals. The transfers to Corbel and resulting distribution to equityholders present a conflict of interest. A minority of the transfers were paid back to the Debtor, but the vast majority were not. While these transfers are often eventually determined to be a distribution or dividend to equity for accounting purposes, such dividends—particularly given that the Debtor later filed for bankruptcy—are alone a major issue. Moreover, the conflict

of interest in the dealing between these affiliates is evidence by the fact that Angelo Pino signed the Promissory Notes on behalf of both the Debtor and Corbel.[37]

Accordingly, there is cause for the appointment of a chapter 11 trustee because of the conflict of interest.

**B.      Appointment is In the Best Interests of Creditors and Other Interests of the Estate Pursuant to Section 1104(a)(2)**

Even if the Court does not find that "cause" exists to appoint a chapter 11 trustee under section 1104(a)(1), the Court may still appoint a trustee if it is in the "interests of the creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2).  "Section 1104(a)(2) envisions a flexible standard and gives the district court discretion to appoint a trustee when doing so would serve the parties' and estate's interests." *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 90 (Bankr. S.D.N.Y. 2007) (internal quotations omitted). In applying section 1104(a)(2), courts should "eschew rigid absolutes and look to the practical realities and necessities." *In re Adelphia Communication Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006) (citations and alterations omitted).

Here, the Debtor's numerous transactions with non-Debtor affiliates should be evaluated by an independent party. Should a chapter 11 trustee be appointed, it would be in a position to both recover assets as well as provide verified and accurate financial disclosures. And to the extent the chapter 11 trustee recovers amounts above the amount owed to the Debtor's creditors,

---

[37] Rule 2004 Transcript at 50:4-6 ("Q.· ·Similar to the prior loan, you signed for both the Debtor and Corbel Communication Industries, correct? A.· ·Yes."); Rule 2004 Transcript at 51:18-21 ("Q.· ·For this Promissory Note for this loan as well, you signed both on behalf of the Debtor and Corbel Communication Industries, correct? A.· ·Yes, that's correct.").

after payment of the expenses for this case, such excess amount would go to the equity holders. The current debtor-in-possession has not shown that a chapter 11 trustee's costs would not outweigh the benefits. The Debtor has not yet filed a plan. Accordingly, the appointment of a chapter 11 trustee would not result in a significant delay to the Debtor's progression through chapter 11. Such appointment is in the best interests of the creditors, any equity security holders, and other interests of the estate.

* * *

Almost 85 years ago, the Supreme Court stated, "the debtor, though left in possession . . . does not operate [the business], as it did before the filing of the petition, unfettered and without restraint." *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 125–126, 60 S.Ct. 1, 12, 84 L.Ed. 110 (1939). What comes with the benefits of bankruptcy are its burdens, and the cost of a chapter 11 trustee is a burden that will help the Debtor emerge from bankruptcy.

*[Remainder of page intentionally left blank.]*

**CONCLUSION**

WHEREFORE, the United States Trustee respectfully requests that the Court enter an

order appointing a chapter 11 trustee and granting such other and further relief as may be deemed

just and proper.

Dated:  New York, New York
        May 7, 2026

                                        WILLIAM K. HARRINGTON
                                        UNITED STATES TRUSTEE

                        By:     */s/ Daniel Rudewicz*
                                Daniel Rudewicz
                                Trial Attorney
                                Office of the United States Trustee
                                Alexander Hamilton Custom House
                                One Bowling Green, Room 534
                                New York, New York 10004
                                Telephone: (212) 510-0500